# CALIFORNIA DENTAL ASSOCIATION *v.* FEDERAL TRADE COMMISSION

No. 97–1625.   Argued January 13, 1999—Decided May 24, 1999

SOUTER, J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Part III, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, KENNEDY, and GINSBURG, JJ., joined, *post*, p. 781.

*Peter M. Sfikas* argued the cause for petitioner. With him on the briefs were *Scott M. Mendel, Erik F. Dyhrkopp,* and *Edward M. Graham.*

*Deputy Solicitor General Wallace* argued the cause for respondent. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Klein, Paul R. Q. Wolfson, Debra A. Valentine, John F. Daly, Joanne L. Levine,* and *Elizabeth R. Hilder.**

---

*Briefs of *amici curiae* urging reversal were filed for the American College for Advancement in Medicine by *Elizabeth Toni Guarino, William C. MacLeod,* and *Robert A. Skitol;* for the American Dental Association et al. by *Jack R. Bierig* and *Virginia A. Seitz;* for the American Society of Association Executives by *Jerry A. Jacobs, Paul M. Smith,* and *Nory Miller;* and for the National Collegiate Athletic Association by *Roy T. Englert, Jr., Donald M. Falk, Gregory L. Curtner, Stephen M. Shapiro, Michael W. McConnell, Michele L. Odorizzi,* and *Elsa Kircher Cole.*

A brief of *amici curiae* urging affirmance was filed for the State of Arizona et al. by *James E. Ryan,* Attorney General of Illinois, *Don R. Sampen,* Assistant Attorney General, *Betty D. Montgomery,* Attorney General of Ohio, and *Thomas G. Lindgren,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren*

JUSTICE SOUTER delivered the opinion of the Court.

There are two issues in this case: whether the jurisdiction of the Federal Trade Commission extends to the California Dental Association (CDA), a nonprofit professional association, and whether a "quick look" sufficed to justify finding that certain advertising restrictions adopted by the CDA violated the antitrust laws. We hold that the Commission's jurisdiction under the Federal Trade Commission Act (FTC Act) extends to an association that, like the CDA, provides substantial economic benefit to its for-profit members, but that where, as here, any anticompetitive effects of given restraints are far from intuitively obvious, the rule of reason demands a more thorough enquiry into the consequences of those restraints than the Court of Appeals performed.

## I

The CDA is a voluntary nonprofit association of local dental societies to which some 19,000 dentists belong, including about three-quarters of those practicing in the State. *In re California Dental Assn.*, 121 F. T. C. 190, 196–197 (1996). The CDA is exempt from federal income tax under 26 U. S. C. § 501(c)(6), covering "[b]usiness leagues, chambers

of California, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *J. Joseph Curran, Jr.*, of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *José A. Fuentes-Agostini* of Puerto Rico, *Jeffrey B. Pine* of Rhode Island, *John Knox Walkup* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.*, of West Virginia, and *James E. Doyle* of Wisconsin.

*James S. Turner* and *Betsy E. Lehrfeld* filed a brief for the Consumer Dental Choice Project of the National Institute for Science, Law and Public Policy, Inc., as *amicus curiae*.

of commerce, real-estate boards, [and] boards of trade," although it has for-profit subsidiaries that give its members advantageous access to various sorts of insurance, including liability coverage, and to financing for their real estate, equipment, cars, and patients' bills. The CDA lobbies and litigates in its members' interests, and conducts marketing and public relations campaigns for their benefit. 128 F. 3d 720, 723 (CA9 1997).

The dentists who belong to the CDA through these associations agree to abide by a Code of Ethics (Code) including the following § 10:

> "Although any dentist may advertise, no dentist shall advertise or solicit patients in any form of communication in a manner that is false or misleading in any material respect. In order to properly serve the public, dentists should represent themselves in a manner that contributes to the esteem of the public. Dentists should not misrepresent their training and competence in any way that would be false or misleading in any material respect." App. 33.

The CDA has issued a number of advisory opinions interpreting this section,[1] and through separate advertising

---

[1] The advisory opinions, which substantially mirror parts of the California Business and Professions Code, see Cal. Bus. & Prof. Code Ann. §§ 651, 1680 (West 1999), include the following propositions:

"A statement or claim is false or misleading in any material respect when it:

"a. contains a misrepresentation of fact;

"b. is likely to mislead or deceive because in context it makes only a partial disclosure of relevant facts;

"c. is intended or is likely to create false or unjustified expectations of favorable results and/or costs;

"d. relates to fees for specific types of services without fully and specifically disclosing all variables and other relevant factors;

guidelines intended to help members comply with the Code and with state law the CDA has advised its dentists of disclosures they must make under state law when engaging in discount advertising.[2]

Responsibility for enforcing the Code rests in the first instance with the local dental societies, to which applicants for CDA membership must submit copies of their own advertisements and those of their employers or referral services to assure compliance with the Code. The local societies also actively seek information about potential Code violations by applicants or CDA members. Applicants who refuse to withdraw or revise objectionable advertisements may be denied membership; and members who, after a hearing, remain

---

"e. contains other representations or implications that in reasonable probability will cause an ordinarily prudent person to misunderstand or be deceived.

"Any communication or advertisement which refers to the cost of dental services shall be exact, without omissions, and shall make each service clearly identifiable, without the use of such phrases as 'as low as,' 'and up,' 'lowest prices,' or words or phrases of similar import.

"Any advertisement which refers to the cost of dental services and uses words of comparison or relativity—for example, 'low fees'—must be based on verifiable data substantiating the comparison or statement of relativity. The burden shall be on the dentist who advertises in such terms to establish the accuracy of the comparison or statement of relativity."

"Advertising claims as to the quality of services are not susceptible to measurement or verification; accordingly, such claims are likely to be false or misleading in any material respect." 128 F. 3d 720, 723–724 (CA9 1997) (some internal quotation marks omitted).

[2] The disclosures include:

"1. The dollar amount of the nondiscounted fee for the service[.]

"2. Either the dollar amount of the discount fee or the percentage of the discount for the specific service[.]

"3. The length of time that the discount will be offered[.]

"4. Verifiable fees[.]

"5. [The identity of] [s]pecific groups who qualify for the discount or any other terms and conditions or restrictions for qualifying for the discount." *Id.*, at 724.

similarly recalcitrant are subject to censure, suspension, or expulsion from the CDA. 128 F. 3d, at 724.

The Commission brought a complaint against the CDA, alleging that it applied its guidelines so as to restrict truthful, nondeceptive advertising, and so violated § 5 of the FTC Act, 38 Stat. 717, 15 U. S. C. § 45.[3] The complaint alleged that the CDA had unreasonably restricted two types of advertising: price advertising, particularly discounted fees, and advertising relating to the quality of dental services. Complaint ¶ 7. An Administrative Law Judge (ALJ) held the Commission to have jurisdiction over the CDA, which, the ALJ noted, had itself "stated that a selection of its programs and services has a potential value to members of between $22,739 and $65,127," 121 F. T. C., at 207. He found that, although there had been no proof that the CDA exerted market power, no such proof was required to establish an antitrust violation under *In re Mass. Bd. of Registration in Optometry*, 110 F. T. C. 549 (1988), since the CDA had unreasonably prevented members and potential members from using truthful, nondeceptive advertising, all to the detriment of both dentists and consumers of dental services. He accordingly found a violation of § 5 of the FTC Act. 121 F. T. C., at 272–273.

The Commission adopted the factual findings of the ALJ except for his conclusion that the CDA lacked market power, with which the Commission disagreed. The Commission treated the CDA's restrictions on discount advertising as illegal *per se*. 128 F. 3d, at 725. In the alternative, the Commission held the price advertising (as well as the nonprice) restrictions to be violations of the Sherman and FTC Acts

---

[3] The FTC Act's prohibition of unfair competition and deceptive acts or practices, 15 U. S. C. § 45(a)(1), overlaps the scope of § 1 of the Sherman Act, 15 U. S. C. § 1, aimed at prohibiting restraint of trade, *FTC* v. *Indiana Federation of Dentists*, 476 U. S. 447, 454–455 (1986), and the Commission relied upon Sherman Act law in adjudicating this case, *In re California Dental Assn.*, 121 F. T. C. 190, 292, n. 5 (1996).

under an abbreviated rule-of-reason analysis. One Commissioner concurred separately, arguing that the Commission should have applied the *Mass. Bd.* standard, not the *per se* analysis, to the limitations on price advertising. Another Commissioner dissented, finding the evidence insufficient to show either that the restrictions had an anticompetitive effect under the rule of reason, or that the CDA had market power. 128 F. 3d, at 725.

The Court of Appeals for the Ninth Circuit affirmed, sustaining the Commission's assertion of jurisdiction over the CDA and its ultimate conclusion on the merits. *Id.*, at 730. The court thought it error for the Commission to have applied *per se* analysis to the price advertising restrictions, finding analysis under the rule of reason required for all the restrictions. But the Court of Appeals went on to explain that the Commission had properly

> "applied an abbreviated, or 'quick look,' rule of reason analysis designed for restraints that are not per se unlawful but are sufficiently anticompetitive on their face that they do not require a full-blown rule of reason inquiry. *See [National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.,* 468 U. S. 85, 109–110, and n. 39 (1984)]* ('The essential point is that the rule of reason can sometimes be applied in the twinkling of an eye.' *[Ibid.* (citing P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981) (parenthetical omitted)).] It allows the condemnation of a 'naked restraint' on price or output without an 'elaborate industry analysis.' *Id.,* at 109." *Id.,* at 727.

The Court of Appeals thought truncated rule-of-reason analysis to be in order for several reasons. As for the restrictions on discount advertising, they "amounted in practice to a fairly 'naked' restraint on price competition itself," *ibid.* The CDA's procompetitive justification, that the re-

strictions encouraged disclosure and prevented false and misleading advertising, carried little weight because "it is simply infeasible to disclose all of the information that is required," *id.*, at 728, and "the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing," *ibid.* As to nonprice advertising restrictions, the court said that

> "[t]hese restrictions are in effect a form of output limitation, as they restrict the supply of information about individual dentists' services. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1505 at 693–94 (Supp. 1997). . . . The restrictions may also affect output more directly, as quality and comfort advertising may induce some customers to obtain nonemergency care when they might not otherwise do so. . . . Under these circumstances, we think that the restriction is a sufficiently naked restraint on output to justify quick look analysis." *Ibid.*

The Court of Appeals went on to hold that the Commission's findings with respect to the CDA's agreement and intent to restrain trade, as well as on the effect of the restrictions and the existence of market power, were all supported by substantial evidence. *Id.*, at 728–730. In dissent, Judge Real took the position that the Commission's jurisdiction did not cover the CDA as a nonprofit professional association engaging in no commercial operations. *Id.*, at 730. But even assuming jurisdiction, he argued, full-bore rule-of-reason analysis was called for, since the disclosure requirements were not naked restraints and neither fixed prices nor banned nondeceptive advertising. *Id.*, at 730–731.

We granted certiorari to resolve conflicts among the Circuits on the Commission's jurisdiction over a nonprofit professional association[4] and the occasions for abbreviated

---

[4] Compare *In re American Medical Assn.*, 94 F. T. C. 701, 983–984, aff'd, 638 F. 2d 443 (CA2 1980), aff'd by an equally divided Court, 455 U. S. 676 (1982) *(per curiam)*, and *FTC v. National Comm'n on Egg Nutrition*, 517

rule-of-reason analysis.[5]    524 U. S. 980 (1998).    We now vacate the judgment of the Court of Appeals and remand.

## II

The FTC Act gives the Commission authority over "persons, partnerships, or corporations," 15 U. S. C. § 45(a)(2), and defines "corporation" to include "any company . . . or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members," § 44.    Although the Circuits have not agreed on the precise extent of this definition, see n. 4, *supra,* the Commission has long held that some circumstances give it jurisdiction over an entity that seeks no profit for itself.    While the Commission has claimed to have jurisdiction over a nonprofit entity if a substantial part of its total activities provides pecuniary benefits to its members, see *In re American Medical Assn.,* 94 F. T. C. 701, 983–984 (1980), respondent now advances the slightly different formulation that the Commission has jurisdiction "over anticompetitive practices by nonprofit associations whose activities provid[e] substantial economic benefits to their for-profit members' businesses."    Brief for Respondent 20.

Respondent urges deference to this interpretation of the Commission's jurisdiction as reasonable.    *Id.,* at 25–26 (citing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore,* 487 U. S. 354, 380–382

F. 2d 485, 487–488 (CA7 1975), with *Community Blood Bank* v. *FTC,* 405 F. 2d 1011, 1017 (CA8 1969).

[5] Cf. *Bogan* v. *Hodgkins,* 166 F. 3d 509, 514, and n. 6 (CA2 1999); *United States* v. *Brown University,* 5 F. 3d 658, 669 (CA3 1993); *Chicago Professional Sports Limited Partnership* v. *National Basketball Assn.,* 961 F. 2d 667, 674–676 (CA7 1992); *Law* v. *National Collegiate Athletic Assn.,* 134 F. 3d 1010, 1020 (CA10 1998); *U. S. Healthcare, Inc.* v. *Healthsource, Inc.,* 986 F. 2d 589, 594–595 (CA1 1993).

(1988) (SCALIA, J., concurring) (*Chevron* deference applies to agency's interpretation of its own statutory jurisdiction)). But we have no occasion to review the call for deference here, the interpretation urged in respondent's brief being clearly the better reading of the statute under ordinary principles of construction.

The FTC Act is at pains to include not only an entity "organized to carry on business for its own profit," 15 U. S. C. § 44, but also one that carries on business for the profit "of its members," *ibid.* While such a supportive organization may be devoted to helping its members in ways beyond immediate enhancement of profit, no one here has claimed that such an entity must devote itself single-mindedly to the profit of others. It could, indeed, hardly be supposed that Congress intended such a restricted notion of covered supporting organizations, with the opportunity this would bring with it for avoiding jurisdiction where the purposes of the FTC Act would obviously call for asserting it.

Just as the FTC Act does not require that a supporting organization must devote itself entirely to its members' profits, neither does the Act say anything about how much of the entity's activities must go to raising the members' bottom lines. There is accordingly no apparent reason to let the statute's application turn on meeting some threshold percentage of activity for this purpose, or even satisfying a softer formulation calling for a substantial part of the nonprofit entity's total activities to be aimed at its members' pecuniary benefit. To be sure, proximate relation to lucre must appear; the FTC Act does not cover all membership organizations of profit-making corporations without more, and an organization devoted solely to professional education may lie outside the FTC Act's jurisdictional reach, even though the quality of professional services ultimately affects the profits of those who deliver them.

There is no line drawing exercise in this case, however, where the CDA's contributions to the profits of its individual

members are proximate and apparent. Through for-profit subsidiaries, the CDA provides advantageous insurance and preferential financing arrangements for its members, and it engages in lobbying, litigation, marketing, and public relations for the benefit of its members' interests. This congeries of activities confers far more than *de minimis* or merely presumed economic benefits on CDA members; the economic benefits conferred upon the CDA's profit-seeking professionals plainly fall within the object of enhancing its members' "profit," [6] which the FTC Act makes the jurisdictional touch-

---

[6] This conclusion is consistent with holdings by a number of Courts of Appeals. In *FTC* v. *National Comm'n on Egg Nutrition,* the Court of Appeals held that a nonprofit association "organized for the profit of the egg industry," 517 F. 2d, at 488, fell within the Commission's jurisdiction. In *American Medical Assn.* v. *FTC,* 638 F. 2d 443 (CA2 1980), the Court of Appeals held that the "business aspects," *id.,* at 448, of the AMA's activities brought it within the Commission's reach. These cases are consistent with our conclusion that an entity organized to carry on activities that will confer greater than *de minimis* or presumed economic benefits on profit-seeking members certainly falls within the Commission's jurisdiction. In *Community Blood Bank* v. *FTC,* the Court of Appeals addressed the question whether the Commission had jurisdiction over a blood bank and an association of hospitals. It held that "the question of the jurisdiction over the corporations or other associations involved should be determined on an ad hoc basis," 405 F. 2d, at 1018, and that the Commission's jurisdiction extended to "any legal entity without shares of capital which engages in business for profit within the traditional meaning of that language," *ibid.* (emphasis deleted). The Court of Appeals also said that "[a]ccording to a generally accepted definition 'profit' means gain from business or investment over and above expenditures, or gain made on business or investment where both receipts or payments are taken into account," *id.,* at 1017, although in the same breath it noted that the term's "meaning must be derived from the context in which it is used," *id.,* at 1016. Our decision here is fully consistent with *Community Blood Bank,* because the CDA contributes to the profits of at least some of its members, even on a restrictive definition of profit as gain above expenditures. (It should go without saying that the FTC Act does not require for Commission jurisdiction that members of an entity turn a profit on their membership, but only that the entity be organized to carry on business for members' profit.) Nonetheless, we do not, and indeed, on the facts here, could

stone. There is no difficulty in concluding that the Commission has jurisdiction over the CDA.

The logic and purpose of the FTC Act comport with this result. The FTC Act directs the Commission to "prevent" the broad set of entities under its jurisdiction "from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U. S. C. § 45(a)(2). Nonprofit entities organized on behalf of for-profit members have the same capacity and derivatively, at least, the same incentives as for-profit organizations to engage in unfair methods of competition or unfair and deceptive acts. It may even be possible that a nonprofit entity up to no good would have certain advantages, not only over a for-profit member but over a for-profit membership organization as well; it would enjoy the screen of superficial disinterest while devoting itself to serving the interests of its members without concern for doing more than breaking even.

Nor, contrary to petitioner's argument, is the legislative history inconsistent with this interpretation of the Commission's jurisdiction. Although the versions of the FTC Act first passed by the House and the Senate defined "corporation" to refer only to incorporated, joint stock, and share-capital companies organized to carry on business for profit, see H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., 11, 14 (1914), the Conference Committee subsequently revised the definition to its present form, an alteration that indicates an

---

not, decide today whether the Commission has jurisdiction over nonprofit organizations that do not confer profit on for-profit members but do, for example, show annual income surpluses, engage in significant commerce, or compete in relevant markets with for-profit players. We therefore do not foreclose the possibility that various paradigms of profit might fall within the ambit of the FTC Act. Nor do we decide whether a purpose of contributing to profit only in a presumed sense, as by enhancing professional educational efforts, would implicate the Commission's jurisdiction.

intention to include nonprofit entities.[7]   And the legislative history, like the text of the FTC Act, is devoid of any hint at an exemption for professional associations as such.

We therefore conclude that the Commission had jurisdiction to pursue the claim here, and turn to the question whether the Court of Appeals devoted sufficient analysis to sustain the claim that the advertising restrictions promulgated by the CDA violated the FTC Act.

## III

The Court of Appeals treated as distinct questions the sufficiency of the analysis of anticompetitive effects and the substantiality of the evidence supporting the Commission's conclusions.   Because we decide that the Court of Appeals erred when it held as a matter of law that quick-look analysis was appropriate (with the consequence that the Commission's abbreviated analysis and conclusion were sustainable), we do not reach the question of the substantiality of the evidence supporting the Commission's conclusion.[8]

In *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.,* 468 U. S. 85 (1984), we held that a "naked restraint on price and output requires some competitive jus-

---

[7] A letter from Bureau of Corporations Commissioner Joseph E. Davies to Senator Francis G. Newlands, the bill's sponsor and a member of the Conference Committee, written August 8, 1914, before the Conference Committee revisions, included a memorandum dated August 7, 1914, that expressed concern that the versions of the bill passed by the House and the Senate would not extend jurisdiction to purportedly nonprofit organizations, which might "furnish convenient vehicles for common understandings looking to the limitation of output and the fixing of prices contrary to law."   Trade Commission Bill: Letter from the Commissioner of Corporations to the Chairman of the Senate Comm. on Interstate Commerce, Transmitting Certain Suggestions Relative to the Bill (H. R. 15613) to Create a Federal Trade Commission, 63d Cong., 2d Sess., 3 (1914).

[8] We leave to the Court of Appeals the question whether on remand it can effectively assess the Commission's decision for substantial evidence on the record, or whether it must remand to the Commission for a more extensive rule-of-reason analysis on the basis of an enhanced record.

tification even in the absence of a detailed market analysis."
*Id.*, at 110. Elsewhere, we held that "no elaborate industry
analysis is required to demonstrate the anticompetitive char-
acter of" horizontal agreements among competitors to refuse
to discuss prices, *National Soc. of Professional Engineers*
v. *United States*, 435 U. S. 679, 692 (1978), or to withhold
a particular desired service, *FTC* v. *Indiana Federation of
Dentists*, 476 U. S. 447, 459 (1986) (quoting *National Soc. of
Professional Engineers, supra*, at 692). In each of these
cases, which have formed the basis for what has come to be
called abbreviated or "quick-look" analysis under the rule
of reason, an observer with even a rudimentary understand-
ing of economics could conclude that the arrangements in
question would have an anticompetitive effect on customers
and markets. In *National Collegiate Athletic Assn.*, the
league's television plan expressly limited output (the number
of games that could be televised) and fixed a minimum price.
468 U. S., at 99–100. In *National Soc. of Professional Engi-
neers*, the restraint was "an absolute ban on competitive bid-
ding." 435 U. S., at 692. In *Indiana Federation of Den-
tists*, the restraint was "a horizontal agreement among the
participating dentists to withhold from their customers a
particular service that they desire." 476 U. S., at 459. As
in such cases, quick-look analysis carries the day when the
great likelihood of anticompetitive effects can easily be as-
certained. See *Law* v. *National Collegiate Athletic Assn.*,
134 F. 3d 1010, 1020 (CA10 1998) (explaining that quick-look
analysis applies "where a practice has obvious anticompeti-
tive effects"); *Chicago Professional Sports Limited Partner-
ship* v. *National Basketball Assn.*, 961 F. 2d 667, 674–676
(CA7 1992) (finding quick-look analysis adequate after as-
sessing and rejecting logic of proffered procompetitive justi-
fications); cf. *United States* v. *Brown University*, 5 F. 3d 658,
677–678 (CA3 1993) (finding full rule-of-reason analysis re-
quired where universities sought to provide financial aid to
needy students and noting by way of contrast that the agree-

ments in *National Soc. of Professional Engineers* and *Indiana Federation of Dentists* "embodied a strong economic self-interest of the parties to them").

The case before us, however, fails to present a situation in which the likelihood of anticompetitive effects is comparably obvious. Even on JUSTICE BREYER's view that bars on truthful and verifiable price and quality advertising are *prima facie* anticompetitive, see *post*, at 784–785 (opinion concurring in part and dissenting in part), and place the burden of procompetitive justification on those who agree to adopt them, the very issue at the threshold of this case is whether professional price and quality advertising is sufficiently verifiable in theory and in fact to fall within such a general rule. Ultimately our disagreement with JUSTICE BREYER turns on our different responses to this issue. Whereas he accepts, as the Ninth Circuit seems to have done, that the restrictions here were like restrictions on advertisement of price and quality generally, see, *e. g.*, *post*, at 785, 787, 790, it seems to us that the CDA's advertising restrictions might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition. The restrictions on both discount and nondiscount advertising are, at least on their face, designed to avoid false or deceptive advertising[9] in a market characterized by striking disparities between the information available to the professional and the patient.[10] Cf. Carr & Mathewson, The Eco-

---

[9] That false or misleading advertising has an anticompetitive effect, as that term is customarily used, has been long established. Cf. *FTC* v. *Algoma Lumber Co.*, 291 U. S. 67, 79–80 (1934) (finding a false advertisement to be unfair competition).

[10] "The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could

nomics of Law Firms: A Study in the Legal Organization of the Firm, 33 J. Law & Econ. 307, 309 (1990) (explaining that in a market for complex professional services, "inherent asymmetry of knowledge about the product" arises because "professionals supplying the good are knowledgeable [whereas] consumers demanding the good are uninformed"); Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, 84 Q. J. Econ. 488 (1970) (pointing out quality problems in market characterized by asymmetrical information). In a market for professional services, in which advertising is relatively rare and the comparability of service packages not easily established, the difficulty for customers or potential competitors to get and verify information about the price and availability of services magnifies the dangers to competition associated with misleading advertising. What is more, the quality of professional services tends to resist either calibration or monitoring by individual patients or clients, partly because of the specialized knowledge required to evaluate the services, and partly because of the difficulty in determining whether, and the degree to which, an outcome is attributable to the quality of services (like a poor job of tooth filling) or to something else (like a very tough walnut). See Leland, Quacks, Lemons, and Licensing: A Theory of Minimum Quality Standards, 87 J. Pol. Econ. 1328, 1330 (1979); 1 B. Furrow, T. Greaney, S. Johnson, T. Jost, & R. Schwartz, Health Law § 3-1, p. 86 (1995) (describing the common view that "the lay public is incapable of adequately evaluating the quality of medical services"). Patients' attachments to particular professionals, the rationality of which is difficult to assess, complicate the picture even further. Cf. Evans, Professionals and the Production Function: Can Competition Policy Improve Efficiency in the Licensed Professions?, in Occupational Licensure and Regulation 235-236 (S. Rotten-

---

properly be viewed as a violation of the Sherman Act in another context, be treated differently." *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773, 788-789, n. 17 (1975).

berg ed. 1980) (describing long-term relationship between professional and client not as "a series of spot contracts" but rather as "a long-term agreement, often implicit, to deal with each other in a set of future unspecified or incompletely specified circumstances according to certain rules," and adding that "[i]t is not clear how or if these [implicit contracts] can be reconciled with the promotion of effective price competition in individual spot markets for particular services"). The existence of such significant challenges to informed decisionmaking by the customer for professional services immediately suggests that advertising restrictions arguably protecting patients from misleading or irrelevant advertising call for more than cursory treatment as obviously comparable to classic horizontal agreements to limit output or price competition.

The explanation proffered by the Court of Appeals for the likely anticompetitive effect of the CDA's restrictions on discount advertising began with the unexceptionable statements that "price advertising is fundamental to price competition," 128 F. 3d, at 727, and that "[r]estrictions on the ability to advertise prices normally make it more difficult for consumers to find a lower price and for dentists to compete on the basis of price," *ibid.* (citing *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 364 (1977); *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 388 (1992)). The court then acknowledged that, according to the CDA, the restrictions nonetheless furthered the "legitimate, indeed procompetitive, goal of preventing false and misleading price advertising." 128 F. 3d, at 728. The Court of Appeals might, at this juncture, have recognized that the restrictions at issue here are very far from a total ban on price or discount advertising, and might have considered the possibility that the particular restrictions on professional advertising could have different effects from those "normally" found in the commercial world, even to the point of promoting competition by reducing the occurrence of unverifiable and misleading across-the-board

discount advertising.[11] Instead, the Court of Appeals confined itself to the brief assertion that the "CDA's disclosure requirements appear to prohibit across-the-board discounts because it is simply infeasible to disclose all of the information that is required," *ibid.*, followed by the observation that "the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing," *ibid.*

But these observations brush over the professional context and describe no anticompetitive effects. Assuming that the record in fact supports the conclusion that the CDA disclosure rules essentially bar advertisement of across-the-board discounts, it does not obviously follow that such a ban would have a net anticompetitive effect here. Whether advertisements that announced discounts for, say, first-time customers, would be less effective at conveying information relevant to competition if they listed the original and discounted prices for checkups, X-rays, and fillings, than they would be if they simply specified a percentage discount across the board, seems to us a question susceptible to empirical but not *a priori* analysis. In a suspicious world, the discipline of specific example may well be a necessary condition of plausibility for professional claims that for all practical purposes defy comparison shopping. It is also possible in principle that, even if across-the-board discount advertisements were more effective in drawing customers in the short run, the recurrence of some measure of intentional or accidental misstatement due to the breadth of their claims might

---

[11] JUSTICE BREYER claims that "the Court of Appeals did consider the relevant differences." *Post*, at 790. But the language he cites says nothing more than that *per se* analysis is inappropriate here and that "some caution" was appropriate where restrictions purported to restrict false advertising, see 128 F. 3d, at 726–727. Caution was of course appropriate, but this statement by the Court of Appeals does not constitute a consideration of the possible differences between these and other advertising restrictions.

leak out over time to make potential patients skeptical of any such across-the-board advertising, so undercutting the method's effectiveness. Cf. Akerlof, 84 Q. J. Econ., at 495 (explaining that "dishonest dealings tend to drive honest dealings out of the market"). It might be, too, that across-the-board discount advertisements would continue to attract business indefinitely, but might work precisely because they were misleading customers, and thus just because their effect would be anticompetitive, not procompetitive. Put another way, the CDA's rule appears to reflect the prediction that any costs to competition associated with the elimination of across-the-board advertising will be outweighed by gains to consumer information (and hence competition) created by discount advertising that is exact, accurate, and more easily verifiable (at least by regulators). As a matter of economics this view may or may not be correct, but it is not implausible, and neither a court nor the Commission may initially dismiss it as presumptively wrong.[12]

In theory, it is true, the Court of Appeals neither ruled out the plausibility of some procompetitive support for the CDA's requirements nor foreclosed the utility of an evidentiary discussion on the point. The court indirectly acknowledged the plausibility of procompetitive justifications for the

---

[12] JUSTICE BREYER suggests that our analysis is "of limited relevance," *post,* at 791, because "[t]he basic question is whether this . . . theoretically redeeming virtue in fact offsets the restrictions' anticompetitive effects in this case," *ibid.* He thinks that the Commission and the Court of Appeals "adequately answered that question," *ibid.,* but the absence of any empirical evidence on this point indicates that the question was not answered, merely avoided by implicit burden shifting of the kind accepted by JUSTICE BREYER. The point is that before a theoretical claim of anticompetitive effects can justify shifting to a defendant the burden to show empirical evidence of procompetitive effects, as quick-look analysis in effect requires, there must be some indication that the court making the decision has properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive. Where, as here, the circumstances of the restriction are somewhat complex, assumption alone will not do.

CDA's position when it stated that "the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing," 128 F. 3d, at 728. But because petitioner alone would have had the incentive to introduce such evidence, the statement sounds as though the Court of Appeals may have thought it was justified without further analysis to shift a burden to the CDA to adduce hard evidence of the procompetitive nature of its policy; the court's adversion to empirical evidence at the moment of this implicit burden shifting underscores the leniency of its enquiry into evidence of the restrictions' anticompetitive effects.

The Court of Appeals was comparably tolerant in accepting the sufficiency of abbreviated rule-of-reason analysis as to the nonprice advertising restrictions. The court began with the argument that "[t]hese restrictions are in effect a form of output limitation, as they restrict the supply of information about individual dentists' services." *Ibid.* (citing P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1505, pp. 693–694 (1997 Supp.)). Although this sentence does indeed appear as cited, it is puzzling, given that the relevant output for antitrust purposes here is presumably not information or advertising, but dental services themselves. The question is not whether the universe of possible advertisements has been limited (as assuredly it has), but whether the limitation on advertisements obviously tends to limit the total delivery of dental services. The court came closest to addressing this latter question when it went on to assert that limiting advertisements regarding quality and safety "prevents dentists from fully describing the package of services they offer," 128 F. 3d, at 728, adding that "[t]he restrictions may also affect output more directly, as quality and comfort advertising may induce some customers to obtain nonemergency care when they might not otherwise do so," *ibid.* This suggestion about output is also puzzling. If quality advertising actually induces some patients to obtain more care

than they would in its absence, then restricting such advertising would reduce the demand for dental services, not the supply; and it is of course the producers' supply of a good in relation to demand that is normally relevant in determining whether a producer-imposed output limitation has the anticompetitive effect of artificially raising prices,[13] see *General Leaseways, Inc.* v. *National Truck Leasing Assn.*, 744 F. 2d 588, 594–595 (CA7 1984) ("An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects").

Although the Court of Appeals acknowledged the CDA's view that "claims about quality are inherently unverifiable and therefore misleading," 128 F. 3d, at 728, it responded that this concern "does not justify banning all quality claims without regard to whether they are, in fact, false or misleading," *ibid.* As a result, the court said, "the restriction is a sufficiently naked restraint on output to justify quick look analysis." *Ibid.* The court assumed, in these words, that some dental quality claims may escape justifiable censure, because they are both verifiable and true. But its implicit

---

[13] JUSTICE BREYER wonders if we "mea[n] this statement as an argument against the anticompetitive tendencies that flow from an agreement not to advertise service quality." *Post,* at 791. But as the preceding sentence shows, we intend simply to question the logic of the Court of Appeals's suggestion that the restrictions are anticompetitive because they somehow "affect output," 128 F. 3d, at 728, presumably with the intent to raise prices by limiting supply while demand remains constant. We do not mean to deny that an agreement not to advertise service quality might have anticompetitive effects. We merely mean that, absent further analysis of the kind JUSTICE BREYER undertakes, it is not possible to conclude that the net effect of this particular restriction is anticompetitive.

assumption fails to explain why it gave no weight to the countervailing, and at least equally plausible, suggestion that restricting difficult-to-verify claims about quality or patient comfort would have a procompetitive effect by preventing misleading or false claims that distort the market. It is, indeed, entirely possible to understand the CDA's restrictions on unverifiable quality and comfort advertising as nothing more than a procompetitive ban on puffery, cf. *Bates*, 433 U. S., at 366 (claims relating to the quality of legal services "probably are not susceptible of precise measurement or verification and, under some circumstances, might well be deceptive or misleading to the public, or even false"); *id.*, at 383–384 ("[A]dvertising claims as to the quality of services . . . are not susceptible of measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction"), notwithstanding JUSTICE BREYER's citation (to a Commission discussion that never faces the issue of the unverifiability of professional quality claims, raised in *Bates*), *post*, at 785.[14]

The point is not that the CDA's restrictions necessarily have the procompetitive effect claimed by the CDA; it is possible that banning quality claims might have no effect at all on competitiveness if, for example, many dentists made very much the same sort of claims. And it is also of course possible that the restrictions might in the final analysis be anticompetitive. The point, rather, is that the plausibility of competing claims about the effects of the professional advertising restrictions rules out the indulgently abbreviated review to which the Commission's order was treated. The obvious anticompetitive effect that triggers abbreviated analysis has not been shown.

---

[14] The Commission said only that "'mere puffing' deceives no one and has never been subject to regulation." 121 F. T. C., at 318. The question here, of course, is not whether puffery may be subject to governmental regulation, but whether a professional organization may ban it.

In light of our focus on the adequacy of the Court of Appeals's analysis, JUSTICE BREYER's thorough-going, *de novo* antitrust analysis contains much to impress on its own merits but little to demonstrate the sufficiency of the Court of Appeals's review. The obligation to give a more deliberate look than a quick one does not arise at the door of this Court and should not be satisfied here in the first instance. Had the Court of Appeals engaged in a painstaking discussion in a league with JUSTICE BREYER's (compare his 14 pages with the Ninth Circuit's 8), and had it confronted the comparability of these restrictions to bars on clearly verifiable advertising, its reasoning might have sufficed to justify its conclusion. Certainly JUSTICE BREYER's treatment of the antitrust issues here is no "quick look." Lingering is more like it, and indeed JUSTICE BREYER, not surprisingly, stops short of endorsing the Court of Appeals's discussion as adequate to the task at hand.

Saying here that the Court of Appeals's conclusion at least required a more extended examination of the possible factual underpinnings than it received is not, of course, necessarily to call for the fullest market analysis. Although we have said that a challenge to a "naked restraint on price and output" need not be supported by "a detailed market analysis" in order to "requir[e] some competitive justification," *National Collegiate Athletic Assn.*, 468 U. S., at 110, it does not follow that every case attacking a less obviously anticompetitive restraint (like this one) is a candidate for plenary market examination. The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like *"per se,"* "quick look," and "rule of reason" tend to make them appear. We have recognized, for example, that "there is often no bright line separating *per se* from Rule of Reason analysis," since "considerable inquiry into market conditions" may be required before the application of any so-called *"per se"* condemnation is justified. *Id.*, at 104, n. 26. "[W]hether the ultimate finding is the product of a presumption or actual

market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Id.*, at 104. Indeed, the scholar who enriched antitrust law with the metaphor of "the twinkling of an eye" for the most condensed rule-of-reason analysis himself cautioned against the risk of misleading even in speaking of a "spectrum" of adequate reasonableness analysis for passing upon antitrust claims: "There is always something of a sliding scale in appraising reasonableness, but the sliding scale formula deceptively suggests greater precision than we can hope for. . . . Nevertheless, the quality of proof required should vary with the circumstances." P. Areeda, Antitrust Law ¶ 1507, p. 402 (1986).[15] At the same time, Professor Areeda also emphasized the necessity, particularly great in the quasi-common law realm of antitrust, that courts explain the logic of their conclusions. "By exposing their reasoning, judges . . . are subjected to others' critical analyses, which in turn can lead to better understanding for the future." *Id.*, ¶ 1500, at 364. As the circumstances here demonstrate, there is generally no categorical line to be drawn between

---

[15] Other commentators have expressed similar views. See, *e. g.*, Kolasky, Counterpoint: The Department of Justice's "Stepwise" Approach Imposes Too Heavy a Burden on Parties to Horizontal Agreements, Antitrust 41, 43 (spring 1998) ("[I]n applying the rule of reason, the courts, as with any balancing test, use a sliding scale to determine how much proof to require"); Piraino, Making Sense of the Rule of Reason: A New Standard for Section 1 of the Sherman Act, 47 Vand. L. Rev. 1753, 1771 (1994) ("[C]ourts will have to undertake varying degrees of inquiry depending upon the type of restraint at issue. The legality of certain restraints will be easy to determine because their competitive effects are obvious. Other restrictions will require a more detailed analysis because their competitive impact is more ambiguous"). But see Klein, A "Stepwise" Approach for Analyzing Horizontal Agreements Will Provide a Much Needed Structure for Antitrust Review, Antitrust 41, 42 (spring 1990) (examination of procompetitive justifications "is by no means a full scrutiny of the proffered efficiency justification. It is, rather, a hard look at the justification to determine if it meets the defendant's burden of coming forward with—but not establishing—a valid efficiency justification").

restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one. And of course what we see may vary over time, if rule-of-reason analyses in case after case reach identical conclusions. For now, at least, a less quick look was required for the initial assessment of the tendency of these professional advertising restrictions. Because the Court of Appeals did not scrutinize the assumption of relative anticompetitive tendencies, we vacate the judgment and remand the case for a fuller consideration of the issue.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE KENNEDY, and JUSTICE GINSBURG join, concurring in part and dissenting in part.

I agree with the Court that the Federal Trade Commission (FTC or Commission) has jurisdiction over petitioner, and I join Parts I and II of its opinion. I also agree that in a "rule of reason" antitrust case "the quality of proof required should vary with the circumstances," that "[w]hat is required . . . is an enquiry meet for the case," and that the object is a "confident conclusion about the principal tendency of a restriction." *Ante,* at 780 and this page (internal quotation marks omitted). But I do not agree that the Court has properly applied those unobjectionable principles here. In my view, a traditional application of the rule of reason to the facts as found by the Commission requires affirming the Commission—just as the Court of Appeals did below.

I

The Commission's conclusion is lawful if its "factual findings," insofar as they are supported by "substantial evidence," "make out a violation of Sherman Act §1." *FTC v. Indiana Federation of Dentists*, 476 U. S. 447, 454–455 (1986). To determine whether that is so, I would not simply ask whether the restraints at issue are anticompetitive overall. Rather, like the Court of Appeals (and the Commission), I would break that question down into four classical, subsidiary antitrust questions: (1) What is the specific restraint at issue? (2) What are its likely anticompetitive effects? (3) Are there offsetting procompetitive justifications? (4) Do the parties have sufficient market power to make a difference?

A

The most important question is the first: What are the specific restraints at issue? See, *e. g., National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U. S. 85, 98–100 (1984) *(NCAA); Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U. S. 1, 21–23 (1979). Those restraints do *not* include merely the agreement to which the California Dental Association's (Dental Association or Association) ethical rule literally refers, namely, a promise to refrain from advertising that is " 'false or misleading in any material respect.' " *Ante*, at 760 (quoting California Dental Code of Ethics § 10 (1993), App. 33). Instead, the Commission found a set of restraints arising out of the way the Dental Association implemented this innocent-sounding ethical rule in practice, through advisory opinions, guidelines, enforcement policies, and review of membership applications. *In re California Dental Assn.*, 121 F. T. C. 190 (1996). As implemented, the ethical rule reached beyond its nominal target, to prevent truthful and nondeceptive advertising. In particular, the Commission determined that the rule, in practice:

(1) "precluded advertising that characterized a dentist's fees as being low, reasonable, or affordable," *id.*, at 301;

(2) "precluded advertising . . . of across the board discounts," *ibid.*; and

(3) "prohibit[ed] all quality claims," *id.*, at 308.

Whether the Dental Association's basic rule *as implemented* actually restrained the truthful and nondeceptive advertising of low prices, across-the-board discounts, and quality service are questions of fact. The Administrative Law Judge (ALJ) and the Commission may have found those questions difficult ones. But both the ALJ and the Commission ultimately found against the Dental Association in respect to these facts. And the question for us—whether those agency findings are supported by substantial evidence, see *Indiana Federation, supra,* at 454–455—is not difficult.

The Court of Appeals referred explicitly to some of the evidence that it found adequate to support the Commission's conclusions. It pointed out, for example, that the Dental Association's "advisory opinions and guidelines indicate that . . . descriptions of prices as 'reasonable' or 'low' do not comply" with the Association's rule; that in "numerous cases" the Association "advised members of objections to special offers, senior citizen discounts, and new patient discounts, apparently without regard to their truth"; and that one advisory opinion "expressly states that claims as to the quality of services are inherently likely to be false or misleading," all "without any particular consideration of whether" such statements were "true or false." 128 F. 3d 720, 729 (CA9 1997).

The Commission itself had before it far more evidence. It referred to instances in which the Association, without regard for the truthfulness of the statements at issue, recommended denial of membership to dentists wishing to advertise, for example, "reasonable fees quoted in advance," "major savings," or "making teeth cleaning . . . inexpensive."

121 F. T. C., at 301. It referred to testimony that "across-the-board discount advertising in literal compliance with the requirements 'would probably take two pages in the telephone book' and '[n]obody is going to really advertise in that fashion.'" *Id.*, at 302. And it pointed to many instances in which the Dental Association suppressed such advertising claims as "we guarantee all dental work for 1 year," "latest in cosmetic dentistry," and "gentle dentistry in a caring environment." *Id.*, at 308–310.

I need not review the evidence further, for this Court has said that "substantial evidence" is a matter for the courts of appeals, and that it "will intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 490–491 (1951). I have said enough to make clear that this is not a case warranting our intervention. Consequently, we must decide only the basic legal question whether the three restraints described above unreasonably restrict competition.

### B

Do each of the three restrictions mentioned have "the potential for genuine adverse effects on competition"? *Indiana Federation*, 476 U. S., at 460; 7 P. Areeda, Antitrust Law ¶ 1503a, pp. 372–377 (1986) (hereinafter Areeda). I should have thought that the anticompetitive tendencies of the three restrictions were obvious. An agreement not to advertise that a fee is reasonable, that service is inexpensive, or that a customer will receive a discount makes it more difficult for a dentist to inform customers that he charges a lower price. If the customer does not know about a lower price, he will find it more difficult to buy lower price service. That fact, in turn, makes it less likely that a dentist will obtain more customers by offering lower prices. And that likelihood means that dentists will prove less likely to offer lower prices. But why should I have to spell out the obvious? To

restrain truthful advertising about lower prices is likely to restrict competition in respect to price—"the central nervous system of the economy." *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 226, n. 59 (1940); cf., *e. g.*, *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 364 (1977) (price advertising plays an "indispensable role in the allocation of resources in a free enterprise system"); *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 765 (1976). The Commission thought this fact sufficient to hold (in the alternative) that the price advertising restrictions were unlawful *per se*. See 121 F. T. C., at 307; cf. *Socony-Vacuum, supra,* at 222–228 (finding agreement among competitors to buy "spot-market oil" unlawful *per se* because of its tendency to restrict price competition). For present purposes, I need not decide whether the Commission was right in applying a *per se* rule. I need only assume a rule of reason applies, and note the serious anticompetitive tendencies of the price advertising restraints.

The restrictions on the advertising of service quality also have serious anticompetitive tendencies. This is not a case of "mere puffing," as the FTC recognized. See 121 F. T. C., at 317–318; cf. *ante,* at 778. The days of my youth, when the billboards near Emeryville, California, home of AAA baseball's Oakland Oaks, displayed the name of "Painless" Parker, Dentist, are long gone—along with the Oakland Oaks. But some parents may still want to know that a particular dentist makes a point of "gentle care." Others may want to know about 1-year dental work guarantees. To restrict that kind of service quality advertisement is to restrict competition over the quality of service itself, for, unless consumers know, they may not purchase, and dentists may not compete to supply that which will make little difference to the demand for their services. That, at any rate, is the theory of the Sherman Act. And it is rather late in the day for anyone to deny the significant anticompetitive tendencies of an agreement that restricts competition in any legitimate respect, see, *e. g.,*

*Paramount Famous Lasky Corp.* v. *United States,* 282 U. S. 30, 43 (1930); *United States* v. *First Nat. Pictures, Inc.,* 282 U. S. 44, 54–55 (1930), let alone one that inhibits customers from learning about the quality of a dentist's service.

Nor did the Commission rely solely on the unobjectionable proposition that a restriction on the ability of dentists to advertise on quality is likely to limit their incentive to compete on quality. Rather, the Commission pointed to record evidence affirmatively establishing that quality-based competition is important to dental consumers in California. 121 F. T. C., at 309–311. Unsurprisingly, these consumers choose dental services based at least in part on "information about the type and quality of service." *Id.,* at 249. Similarly, as the Commission noted, the ALJ credited testimony to the effect that "advertising the comfort of services will 'absolutely' bring in more patients," and, conversely, that restraining the ability to advertise based on quality would decrease the number of patients that a dentist could attract. *Id.,* at 310. Finally, the Commission looked to the testimony of dentists who themselves had suffered adverse effects on their business when forced by petitioner to discontinue advertising quality of care. See *id.,* at 310–311.

The FTC found that the price advertising restrictions amounted to a "naked attempt to eliminate price competition." *Id.,* at 300. It found that the service quality advertising restrictions "deprive consumers of information they value and of healthy competition for their patronage." *Id.,* at 311. It added that the "anticompetitive nature of these restrictions" was "plain." *Ibid.* The Court of Appeals agreed. I do not believe it possible to deny the anticompetitive tendencies I have mentioned.

### C

We must also ask whether, despite their anticompetitive tendencies, these restrictions might be justified by other procompetitive tendencies or redeeming virtues. See 7 Areeda,

¶ 1504, at 377–383.   This is a closer question—at least in theory.   The Dental Association argues that the three relevant restrictions are inextricably tied to a legitimate Association effort to restrict false or misleading advertising.   The Association, the argument goes, had to prevent dentists from engaging in the kind of truthful, nondeceptive advertising that it banned in order effectively to stop dentists from making unverifiable claims about price or service quality, which claims would mislead the consumer.

The problem with this or any similar argument is an empirical one.   Notwithstanding its theoretical plausibility, the record does not bear out such a claim.   The Commission, which is expert in the area of false and misleading advertising, was uncertain whether petitioner had even *made* the claim.   It characterized petitioner's efficiencies argument as rooted in the (unproved) factual assertion that its ethical rule "challenges *only* advertising that is false or misleading." 121 F. T. C., at 316 (emphasis added).   Regardless, the Court of Appeals wrote, in respect to the price restrictions, that "the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing." 128 F. 3d, at 728.   With respect to quality advertising, the Commission stressed that the Association "offered no convincing argument, let alone evidence, that consumers of dental services have been, or are likely to be, harmed by the broad categories of advertising it restricts."   121 F. T. C., at 319.   Nor did the Court of Appeals think that the Association's unsubstantiated contention that "claims about quality are inherently unverifiable and therefore misleading" could "justify banning all quality claims without regard to whether they are, in fact, false or misleading."   128 F. 3d, at 728.

With one exception, my own review of the record reveals no significant evidentiary support for the proposition that the Association's members must agree to ban truthful price and quality advertising in order to stop untruthful claims. The one exception is the obvious fact that one can stop un-

truthful advertising if one prohibits all advertising. But since the Association made virtually no effort to sift the false from the true, see 121 F. T. C., at 316–317, that fact does not make out a valid antitrust defense. See *NCAA,* 468 U. S., at 119; 7 Areeda, ¶ 1505, at 383–384.

In the usual Sherman Act § 1 case, the defendant bears the burden of establishing a procompetitive justification. See *National Soc. of Professional Engineers* v. *United States,* 435 U. S. 679, 695 (1978); 7 Areeda, ¶ 1507b, at 397; 11 H. Hovenkamp, Antitrust Law ¶ 1914c, pp. 313–315 (1998); see also *Law* v. *National Collegiate Athletic Assn.,* 134 F. 3d 1010, 1019 (CA10), cert. denied, 525 U. S. 822 (1998); *United States* v. *Brown Univ.,* 5 F. 3d 658, 669 (CA3 1993); *Capital Imaging Associates* v. *Mohawk Valley Medical Associates, Inc.,* 996 F. 2d 537, 543 (CA2), cert. denied, 510 U. S. 947 (1993); *Kreuzer* v. *American Academy of Periodontology,* 735 F. 2d 1479, 1492–1495 (CADC 1984). And the Court of Appeals was correct when it concluded that no such justification had been established here.

## D

I shall assume that the Commission must prove one additional circumstance, namely, that the Association's restraints would likely have made a real difference in the marketplace. See 7 Areeda, ¶ 1503, at 376–377. The Commission, disagreeing with the ALJ on this single point, found that the Association did possess enough market power to make a difference. In at least one region of California, the midpeninsula, its members accounted for more than 90% of the marketplace; on average they accounted for 75%. See 121 F. T. C., at 314. In addition, entry by new dentists into the marketplace is fairly difficult. Dental education is expensive (leaving graduates of dental school with $50,000–$100,000 of debt), as is opening a new dentistry office (which costs $75,000–$100,000). *Id.,* at 315–316. And Dental Association members believe membership in the Association is

important and valuable and recognized as such by the public. *Id.*, at 312–313, 315–316.

These facts, in the Court of Appeals' view, were sufficient to show "enough market power to harm competition through [the Association's] standard setting in the area of advertising." 128 F. 3d, at 730. And that conclusion is correct. Restrictions on advertising price discounts in Palo Alto may make a difference because potential patients may not respond readily to discount advertising by the handful (10%) of dentists who are not members of the Association. And that fact, in turn, means that the remaining 90% will prove less likely to engage in price competition. Facts such as these have previously led this Court to find market power— unless the defendant has overcome the showing with strong contrary evidence. See, *e. g.*, *Indiana Federation*, 476 U. S., at 456–457; cf. *United States* v. *Loew's Inc.*, 371 U. S. 38, 45 (1962); *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 341–344 (1962); accord, *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 424 (CA2 1945). I can find no reason for departing from that precedent here.

## II

In the Court's view, the legal analysis conducted by the Court of Appeals was insufficient, and the Court remands the case for a more thorough application of the rule of reason. But in what way did the Court of Appeals fail? I find the Court's answers to this question unsatisfactory—when one divides the overall Sherman Act question into its traditional component parts and adheres to traditional judicial practice for allocating the burdens of persuasion in an antitrust case.

Did the Court of Appeals misconceive the anticompetitive tendencies of the restrictions? After all, the object of the rule of reason is to separate those restraints that "may suppress or even destroy competition" from those that "merely regulat[e] and perhaps thereby promot[e] competition." *Board of Trade of Chicago* v. *United States*, 246 U. S. 231,

238 (1918). The majority says that the Association's "advertising restrictions might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *Ante*, at 771. It adds that

> "advertising restrictions arguably protecting patients from misleading or irrelevant advertising call for more than cursory treatment as obviously comparable to classic horizontal agreements to limit output or price competition." *Ante*, at 773.

And it criticizes the Court of Appeals for failing to recognize that "the restrictions at issue here are very far from a total ban on price or discount advertising" and that "the particular restrictions on professional advertising could have different effects from those 'normally' found in the commercial world, even to the point of promoting competition . . . ." *Ibid.*

The problem with these statements is that the Court of Appeals did consider the relevant differences. It *rejected* the legal "treatment" customarily applied "to classic horizontal agreements to limit output or price competition"—*i. e.*, the FTC's (alternative) *per se* approach. See 128 F. 3d, at 726–727. It did so because the Association's "policies do not, on their face, ban truthful nondeceptive ads"; instead, they "have been enforced in a way that restricts truthful advertising," *id.*, at 727. It added that "[t]he value of restricting false advertising . . . counsels some caution in attacking rules that purport to do so but merely sweep too broadly." *Ibid.*

Did the Court of Appeals misunderstand the nature of an anticompetitive effect? The Court says:

> "If quality advertising actually induces some patients to obtain more care than they would in its absence, then restricting such advertising would reduce the demand for dental services, not the supply; and . . . the producers' supply . . . is normally relevant in determining

whether a . . . limitation has the anticompetitive effect of artificially raising prices." *Ante*, at 776–777.

But if the Court means this statement as an argument against the anticompetitive tendencies that flow from an agreement not to advertise service quality, I believe it is the majority, and not the Court of Appeals, that is mistaken. An agreement not to advertise, say, "gentle care" is anticompetitive because it imposes an artificial barrier against each dentist's independent decision to advertise gentle care. That barrier, in turn, tends to inhibit those dentists who want to supply gentle care from getting together with those customers who want to buy gentle care. See P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1505′, p. 404 (Supp. 1998). There is adequate reason to believe that tendency present in this case. See *supra*, at 786.

Did the Court of Appeals inadequately consider possible procompetitive justifications? The Court seems to think so, for it says:

> "[T]he [Association's] rule appears to reflect the prediction that any costs to competition associated with the elimination of across-the-board advertising will be outweighed by gains to consumer information (and hence competition) created by discount advertising that is exact, accurate, and more easily verifiable (at least by regulators)." *Ante*, at 775.

That may or may not be an accurate assessment of the Association's motives in adopting its rule, but it is of limited relevance. Cf. *Board of Trade of Chicago, supra*, at 238. The basic question is whether this, or some other, theoretically redeeming virtue in fact offsets the restrictions' anticompetitive effects in this case. Both court and Commission adequately answered that question.

The Commission found that the defendant did not make the necessary showing that a redeeming virtue existed in practice. See 121 F. T. C., at 319–320. The Court of Ap-

peals, asking whether the rules, as enforced, "augment[ed] competition and increase[d] market efficiency," found the Commission's conclusion supported by substantial evidence. 128 F. 3d, at 728. That is why the court said that "the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing"— which is to say that the record provides no evidence that the effects, though anticompetitive, are nonetheless redeemed or justified. *Ibid.*

The majority correctly points out that "petitioner alone would have had the incentive to introduce such evidence" of procompetitive justification. *Ante,* at 776. (Indeed, that is one of the reasons defendants normally bear the burden of persuasion about redeeming virtues. See *supra,* at 788.) But despite this incentive, petitioner's brief in this Court offers nothing concrete to counter the Commission's conclusion that the record does not support the claim of justification. Petitioner's failure to produce such evidence itself "explain[s] why [the lower court] gave no weight to the . . . suggestion that restricting difficult-to-verify claims about quality or patient comfort would have a procompetitive effect by preventing misleading or false claims that distort the market." *Ante,* at 778.

With respect to the restraint on advertising across-the-board discounts, the majority summarizes its concerns as follows: "Assuming that the record in fact supports the conclusion that the [Association's] disclosure rules essentially bar advertisement of [such] discounts, it does not obviously follow that such a ban would have a net anticompetitive effect here." *Ante,* at 774. I accept, rather than assume, the premise: The FTC found that the disclosure rules did bar advertisement of across-the-board discounts, and that finding is supported by substantial evidence. See *supra,* at 783–784. And I accept as *literally* true the conclusion that the Court says follows from that premise, namely, that "net anticompetitive effects" do not *"obviously"* follow from that

premise. But obviousness is not the point. With respect to any of the three restraints found by the Commission, whether "net anticompetitive effects" follow is a matter of how the Commission, and, here, the Court of Appeals, have answered the questions I laid out at the beginning. See *supra*, at 782. Has the Commission shown that the restriction has anticompetitive tendencies? It has. Has the Association nonetheless shown offsetting virtues? It has not. Has the Commission shown market power sufficient for it to believe that the restrictions will likely make a real world difference? It has.

The upshot, in my view, is that the Court of Appeals, applying ordinary antitrust principles, reached an unexceptional conclusion. It is the same legal conclusion that this Court itself reached in *Indiana Federation*—a much closer case than this one. There the Court found that an agreement by dentists not to submit dental X rays to insurers violated the rule of reason. The anticompetitive tendency of that agreement was to reduce competition among dentists in respect to their willingness to submit X rays to insurers, see 476 U. S., at 456—a matter in respect to which consumers are relatively indifferent, as compared to advertising of price discounts and service quality, the matters at issue here. The redeeming virtue in *Indiana Federation* was the alleged undesirability of having insurers consider a range of matters when deciding whether treatment was justified—a virtue no less plausible, and no less proved, than the virtue offered here. See *id.*, at 462–464. The "power" of the dentists to enforce their agreement was no greater than that at issue here (control of 75% to 90% of the relevant markets). See *id.*, at 460. It is difficult to see how the two cases can be reconciled.

\*    \*    \*

I would note that the form of analysis I have followed is not rigid; it admits of some variation according to the circumstances. The important point, however, is that its allocation

of the burdens of persuasion reflects a gradual evolution within the courts over a period of many years. That evolution represents an effort carefully to blend the procompetitive objectives of the law of antitrust with administrative necessity. It represents a considerable advance, both from the days when the Commission had to present and/or refute every possible fact and theory, and from antitrust theories so abbreviated as to prevent proper analysis. The former prevented cases from ever reaching a conclusion, cf. Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 266 (1960), and the latter called forth the criticism that the "Government always wins," *United States* v. *Von's Grocery Co.*, 384 U. S. 270, 301 (1966) (Stewart, J., dissenting). I hope that this case does not represent an abandonment of that basic, and important, form of analysis.

For these reasons, I respectfully dissent from Part III of the Court's opinion.