2008 OK CIV APP 57

**VANGUARD ENVIRONMENTAL, INC., Plaintiff/Appellant,**

v.

**Misty Lynn CURLER, Defendant/Appellee.**

No. 104,097.

Court of Civil Appeals of Oklahoma, Division No. 2.

Oct. 3, 2007.

As Corrected April 21, 2008.

J. Patrick Mensching, Lyons, Clark & Mensching, Tulsa, OK, for Plaintiff/Appellant.

Robert J. Bartz, Joe M. Fears, Barber & Bartz, Tulsa, OK, for Defendant/Appellee.

JOHN F. FISCHER, Presiding Judge.

¶1 This is an employer's appeal from an order granting summary judgment to a former employee in an action seeking injunctive relief and damages arising out of alleged breach of restrictive covenants contained in an employment contract. This appeal has been assigned to the accelerated docket pursuant to Oklahoma Supreme Court Rule 1.36(b); 12 O.S. Supp.2006, ch. 15, app. 1, and the matter stands submitted without appellate briefing. Based on our review of the record on appeal and applicable law, we affirm.

## PROCEDURAL AND BACKGROUND FACTS

¶2 Plaintiff Vanguard Environmental, Inc., operates an environmental and safety compli-

ance business in Tulsa, Oklahoma. On April 26, 2000, Vanguard entered into a written Employment Agreement with Defendant Misty Curler that contained a restrictive covenant governing Curler's post-employment activities.

¶ 3 On November 28, 2005, Curler resigned her employment with Vanguard and went to work for Cinnabar Environmental Services, a Tulsa based competitor of Vanguard. Vanguard sued Curler, alleging six theories of recovery. Curler filed a motion for summary judgment arguing, among other things, that the restrictions on competition and client solicitation found in the Employment Agreement were overly broad, unreasonable, and, therefore, unenforceable as an illegal restraint of trade within the meaning of 15 O.S.1991 § 217.[1]

 ¶ 4 Vanguard filed an objection arguing that the restrictive covenants were neither overly broad nor in violation of public policy. Vanguard also claimed that material disputed facts precluded summary judgment.

However, with two exceptions, Vanguard either unequivocally admitted each of Curler's asserted material facts or admitted those facts adding a "gloss" favorable to its position.[2] Vanguard did not offer any additional material facts, relying on the factual record in Curler's motion. Following a hearing, the Trial Court granted judgment in favor of Curler as to all of Vanguard's claims.[3] It is from that judgment that Vanguard has filed this timely appeal.

## ISSUES PRESERVED FOR APPEAL

 ¶ 5 The petition in error in an accelerated procedure case must comply with the general rules regarding petitions in error. Okla. Sup.Ct. R. 1.36, 12 O.S. Supp. 2006, ch. 15, app. 1. The form of the petition in error is set forth in Rule 1.301, Form No. 5, and requires the appellant to "[i]nclude each point of law alleged as error," and cautions: "Avoid general statements such as 'Judgment not supported by law.' " [4]

1. Curler also argued that she was entitled to judgment as a matter of law on all six of Vanguard's theories of recovery asserted in its petition. For the reasons stated *infra*, the only issue with which this appeal is concerned is the enforceability of the post-employment restraint.

2. As to the two facts not admitted, Curler's claim that (1) she did not take or use any Vanguard documents and (2) made no untrue or disparaging statements to potential clients, Vanguard argued that Curler's affidavit was insufficient evidentiary support for these facts.

3. The Journal Entry of Judgment recites that the Trial Court considered the "pleadings, briefs and affidavits, together with arguments of counsel and the deposition of Misty Lynn Curler taken on the 3rd day of October 2006." This deposition was not filed with the court clerk, and no excerpts from it were attached to any of the summary judgment submissions. Only those evidentiary materials (1) on file; (2) filed with the summary judgment motion or response thereto; or (3) subsequently filed with leave of court may be considered as properly "placed before the trial court in the decisional process leading to summary judgment." *Myers v. Missouri Pac. R.R. Co.*, 2002 OK 60, ¶ 18, 52 P.3d 1014, 1021–22. *See also* Okla. Dist. Ct. R. 13(a), (b) and (h)(4), 12 O.S. Supp.2006, ch. 2, app. Although depositions are no longer required to be filed in the district court as a matter of course, they must, nevertheless, be filed of record in the district court in conformity with Rule 13 or they cannot be considered as part of the record on

accelerated appeal. Okla. Sup.Ct. R. 1.36(c)(A)(4), 12 O.S. Supp.2006, ch. 15, app. 1. *See* 12 O.S. Supp.2006 § 3230(G) (providing that depositions shall not be filed with the court clerk *"[e]xcept on order of the court or unless a deposition is attached to a motion, response thereto, is needed for use in a trial or hearing, or the parties stipulate otherwise ...."*). Before deposition material can be reviewed on appeal from a summary judgment, it "must be *both* filed in the court clerk's office and shown by the record to have been tendered for the trial court's consideration." *Hadnot v. Shaw*, 1992 OK 21, ¶ 8, 826 P.2d 978, 982 (citing *Hulsey v. Mid–America Preferred Ins. Co.*, 1989 OK 107, ¶ 7, 777 P.2d 932, 935–36). *See also Anderson v. Eichner*, 1994 OK 136, n. 7, 890 P.2d 1329, 1334 n. 7 ("Deposition testimony sought to be used as evidentiary material in the summary judgment process must be placed into the record in compliance with Rule 13.").

4. Absent limited circumstances not applicable here, an appellate court is "confined to the issues raised by the parties and presented by the proof, pleadings, petition in error and briefs." *Mooney v. Mooney*, 2003 OK 51, n. 3, 70 P.3d 872, 876 n. 3 (citing *Reddell v. Johnson*, 1997 OK 86, ¶ 6, 942 P.2d 200, 202). In cases submitted without briefing pursuant to Rule 1.36, the petition in error plays a critical role in determining what issues the appellant has preserved for consideration on appeal. *See Booker v. Sumner*, 2001 OK CIV APP 22, ¶¶ 6–12, 19 P.3d 904, 906. Because the appellant does not have the opportunity to

¶ 6 The "Issues To be Raised on Appeal" section of Vanguard's petition in error consists of two paragraphs.[5] However, the only preserved appellate challenge to the Trial Court's judgment is Vanguard's assertion that the non-solicitation portion of the restrictive covenant is not an unreasonable restraint of trade.[6]

## STANDARD OF REVIEW

¶ 7 "Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Davis v. Leitner*, 1989 OK 146, ¶ 9, 782 P.2d 924, 926. In reviewing summary judgment, we must view all inferences and conclusions to be drawn from the evidentiary materials in the light most favorable to the party opposing the motion. *Id.* However, once the movant has shown the absence of disputed material facts and entitlement to judgment on that record, the burden shifts to the defending party to show the existence of a triable issue. *Hughey v. Grand River Dam Auth.*, 1995 OK 56, ¶ 8, 897 P.2d 1138, 1143.

¶ 8 Determining the enforceability of the kind of restrictive covenants at issue in

this appeal is particularly fact dependant, for the reasons we discuss *infra*, and requires an analysis of the effect of the covenant on competition in the relevant market. Ultimately, however, this involves an interpretation of the contractual provision at issue, an issue of law. *See Bayly, Martin & Fay, Inc. v. Pickard*, 1989 OK 122, ¶ 11, 780 P.2d 1168, 1171. *See also Key Temp. Pers., Inc. v. Cox*, 1994 OK CIV APP 123, ¶ 7, 884 P.2d 1213, 1215. Although a trial court considers factual matters when deciding whether summary judgment is appropriate, its ultimate decision, whether one party is entitled to judgment as a matter of law because no material facts are disputed, is purely legal. *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053. The record of undisputed material facts before the Trial Court was sufficient to determine the enforceability of the Vanguard covenant. The applicable standard of review of the Trial Court's judgment in favor of Curler is, therefore, *de novo*. *Id.*

## DISCUSSION

¶ 9 The parties correctly argue that 15 O.S.1991 § 217 is the controlling statute.[7] The version of section 217 relevant to this appeal provides:

---

cure omitted allegations of error or remedy insufficient "shotgun" appellate pleading by timely filing a brief in chief, "[t]he role of the petition in error as a mechanism with which to enlighten appellate courts of alleged trial court error is even more important." *Id.* at ¶ 12, 19 P.3d at 906.

5. In the first paragraph, Vanguard claims that the Trial Court erred in granting summary judgment "for the reason that no evidence of any kind was presented by [Curler] in her [summary judgment motion] tending to establish that the anti-solicitation provisions in question were unreasonable under the circumstances." Vanguard concludes this first paragraph by stating: "A trial court should not grant summary judgment if reasonable minds could draw different inferences or conclusions from the facts." In the second paragraph, Vanguard complains that "no testimony of any kind was presented to the Court establishing why any reasonable person would conclude that the anti-solicitation provisions were unquestionably an undue restraint of trade." It then asserts that "the Trial Court had no basis to determine the anti-solicitation provisions constituted an unreasonable restraint of

trade, other than the express provisions of the Employment Agreement in question."

6. Consequently, this Court will not address the Trial Court's judgment in favor of Curler on any of the other claims for relief that Vanguard asserted in its petition.

7. Section 217 was amended effective June 4, 2001, after execution of the employment agreement between the parties. Neither party argues the statute, as amended, applies. The general rule is that statutes are to be construed as having a prospective operation unless the purpose and intent of the legislature give them a retrospective effect as expressly declared or implied from the language used. *See Thomas v. Cumberland Operating Co.*, 1977 OK 164, 569 P.2d 974. No such declaration appears in the amended version of section 217. The amendment reflected the enactment of 15 O.S.2001 § 219A, adding that section to the two existing statutory exceptions to section 217. Section 219A addresses the permitted scope of some non-competition agreements between employers and employees. Section 219A(B) adds language to section 217 acknowledging the enactment of section 219A.

Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, is to that extent void.[8] The language of Section 217 was enacted by the first Oklahoma Legislature, remained unchanged until amended in 2001, and is identical to the statute in effect in the Oklahoma Territory immediately prior to statehood. *See* Wilson's Rev. & Ann. Stat.1903, ch. 15, art. 4, § 819; *see also Hulen v. Earel,* 1903 OK 76, 73 P. 927. In addition to a lengthy legislative history, the statute has a well-developed legal history, which is critical to the resolution of this case.

¶ 10 Common law contracts between competitors that fixed the price of goods or services, limited the availability of those goods or services or reduced their quality came to be known as contracts "in restraint of trade." *Standard Oil Co. of New Jersey v. U.S.,* 221 U.S. 1, 54, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Consequently, it is not without significance that "restraint of trade" language was included in section 217 at approximately the same time the United States Congress was passing the Sherman Act, prohibiting "[e]very contract, combination ... or conspiracy in restraint of trade," 15 U.S.C.A. § 1 (1997), and the Oklahoma Legislature was passing the State counterpart prohibiting: "Every act, agreement, contract, or combination ... in restraint of trade." Okla.Rev.Stat. § 8220 § 1 (1912).[9] "[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil,* 221 U.S. at 59, 31 S.Ct. at 515. *See also Cooper v. Tanaka,* 1978 OK CIV APP 12, ¶ 7, 591 P.2d 1181,

1183. ("[W]e believe that the concept 'restraint of trade' as used in 79 O.S.1971, § 1, was used by our legislature in its common law sense and thus declares illegal only contracts unreasonably in restraint of trade.").

¶ 11 Every contract restrains trade to some extent. *Board of Trade of City of Chicago v. U.S.,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). For example, Curler's employment contract precluded her from providing services to another employer during the term of her employment.[10] Despite the literal prohibition of these statutes, the legality of an employment contract is rarely challenged as a trade restraint during the term of employment.[11] Consequently, the United States Supreme Court first announced in *Standard Oil* that the Sherman Act was to be interpreted pursuant to the "standard of reason which had been applied at common law." *Standard Oil,* 221 U.S. at 60, 31 S.Ct. at 516. The classic statement of what came to be known as the Rule of Reason is in the *Chicago Board of Trade* case:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 242 (1918). *See also Petition of Grand River Dam Auth.,* 1957 OK 323, 320 P.2d 706 (applying the Rule of Reason standard in a case involving the constitutional prohibition on monopolies in Okla. Const. art. 2, § 32, rather than 79 O.S.2001 § 203(A)).

¶ 12 The Oklahoma Supreme Court adopted the Rule of Reason for the interpretation of 79 O.S.1971 § 1, in *Board of Regents of the Univ. of Oklahoma v. National Collegiate Athletic Association,* 1977 OK 17, ¶ 15, 561 P.2d 499, 506. This same Rule of

---

8. The two statutory exceptions (Section 218), sale of the good will of a business and (Section 219) dissolution of a partnership, are not applicable to this case.

9. Now codified as 79 O.S.2001 § 203(A).

10. Paragraph 8 of Exhibit A to the Vanguard Employment Agreement permits "moonlighting" except in the "Env'l, Health & Safety Compliance field."

11. *But see, Oltz v. St. Peter's Cmty. Hosp.,* 861 F.2d 1440 (9th Cir.1988) (affirming judgment for a nurse anesthetist claiming a Sherman Act violation by a rural hospital with over 80 percent of the relevant market and an anesthesia group that entered into an exclusive employment agreement, which resulted in the denial of staff privileges to the plaintiff and, therefore, his ability to work in that market).

Reason analysis has also been adopted for the interpretation of section 217. *See Bayly*, 1989 OK 122 at ¶ 11, 780 P.2d at 1171 (footnotes omitted) ("Although the rule of reason which requires that in order to be valid, a covenant must be deemed reasonable by the court, had been incorporated as a matter of law into agreements falling within the parameters of 79 O.S.1981 § 1, its application to § 217 was questionable before the *Crown Paint* and *NCAA* decisions.").

¶ 13 Consequently, there is no theoretical difference between the analysis required by 79 O.S. § 1 and that required by 15 O.S.1991 § 217. However, no Oklahoma decision has yet employed a comprehensive Rule of Reason analysis to determine the enforceability of a post-employment restraint contained in an employment agreement. Nonetheless, cases decided pursuant to section 1 of title 79 are instructive in determining the extent of that analysis as applied to 15 O.S.1991 § 217, just as federal antitrust law is instructive in determining the application of that test to state antitrust law. *See Board of Regents*, 1977 OK 17 at n. 13, 561 P.2d at 505 n. 13.

¶ 14 As it has been developed, a Rule of Reason analysis requires determination of three issues: (1) the relevant market,[12] (2) the effect of the restraint on competition in that market[13] and (3) if the effect is anticompetitive, whether any pro-competitive benefits outweigh the anticompetitive effects.[14]

¶ 15 A complete Rule of Reason analysis, however, is not necessary in every case.[15] If the anticompetitive effect of a particular restraint is obvious, an "abbreviated analysis" may be appropriate. *California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 778, 119 S.Ct. 1604, 1617, 143 L.Ed.2d 935 (1999). *See also Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (holding the legality of an agreement among competitors not to discuss prices could be determined without "elaborate industry analysis"); *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 109–110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (finding "detailed market analysis" unnecessary to invalidate a price and output restriction in the absence of "some competitive justification"); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (holding it unnecessary to precisely define the relevant market before finding horizontal agreement to withhold x-rays from customers an unreasonable restraint of trade). Although *California Dental* criticized this approach, it is often used regarding restrictive covenants in employment agreements.[16]

¶ 16 The essential purpose of the analysis remains, however, the protection of

12. *Teleco, Inc. v. Ford Indus., Inc.*, 1978 OK 159, n. 11, 587 P.2d 1360, 1364, n. 11, and the federal antitrust cases cited therein.

13. *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). This may require analysis of market power and market concentration. *California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 788, 119 S.Ct. 1604, 1621, 143 L.Ed.2d 935 (1999)(Breyer, J., dissenting).

14. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 18–23, 99 S.Ct. 1551, 1561–64, 60 L.Ed.2d 1 (1979).

15. For example, some restraints are so injurious to competition that they are considered unlawful as a matter of law. *See Crown Paint Co. v. Bankston*, 1981 OK 104, ¶ 7, 640 P.2d 948, 950; *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Agreements between competitors to fix the price of goods or services, the chief "evil" of monopolies, is the most widely recognized of these *per se* offenses. *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). But equally prohibited by the *per se* rule, as it was at common law, is an agreement between competitors to divide markets by customers or territory. *See U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In the context of post-employment restraints, however, partial customer and/or territory allocations to take effect in the future, between would-be competitors but parties who are not competitors at the time of contracting, have not been treated as *per se* violations. *See, e.g., Tatum v. Colonial Life & Accident Ins. Co.*, 1970 OK 27, 465 P.2d 448.

16. *See, e.g., E.S. Miller Laboratories v. Griffin*, 1948 OK 149, 194 P.2d 877 (finding unenforceable a prohibition on every kind of employment for a competing firm in the territory to which a pharmaceutical salesman had been assigned). The Court did not analyze or define the relevant product market, but that would not have changed the result. The ban on all employment would have included pharmaceutical sales.

competition. "It is axiomatic that the antitrust laws were passed 'for the protection of competition, not competitors.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993) (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). "The fundamental test of the reasonableness of a restraint is its effect on the public." *Board of Regents*, 1977 OK 17 at ¶ 15, 561 P.2d at 506. Section 217 "was adopted for the protection of individuals engaged in lawful professions, trades and business, and for the protection of the public." *Neil v. Pennsylvania Life Ins. Co.*, 1970 OK 172, ¶ 8, 474 P.2d 961, 963. A Rule of Reason analysis provides an analytical framework for consistent application of uniform legal principles to determine what is "reasonable" regardless of the nuances and particularities of the market at issue.

¶ 17 Rule of Reason analysis was applied by the Oklahoma Supreme Court in *Tatum v. Colonial Life & Accident Ins. Co.*, 1970 OK 27, 465 P.2d 448, resulting in the enforcement of a narrowly drawn post-employment restrictive covenant in an employment agreement. The Court determined that the relevant product market consisted of the lines of insurance sold by the departing employee while employed, and the geographic market was defined as those customers of the employer previously serviced by the departing employee.[17] Within this relevant market, the covenant did not prevent the employee from selling other lines of insurance to existing customers of the former employer; it did not prohibit the sale of any line of insurance including those sold while employed to any client who was not a customer of the former employer, and it did not prevent the employee from accepting the same lines of business

from customers of the former employer if unsolicited by the employee.

¶ 18 The *Tatum* Court found that the agreement (1) was intended to prevent the former employee from using confidential information disclosed to him and customer relationships developed by him during his employment to compete with his former employer for a limited period of time after the employment terminated and (2) was no more restrictive than necessary to accomplish that intention. Unlike the agreement in the *Miller Laboratory* case, the *Tatum* agreement did not otherwise prevent competition by the employee, and, therefore, did "not come within the purview of 15 O.S.1961 § 217." *Tatum*, 1970 OK 27 at ¶ 10, 465 P.2d at 452.[18]

¶ 19 Central to the Oklahoma Supreme Court's decision in *Crown Paint Co. v. Bankston*, 1981 OK 104, 640 P.2d 948, was its analysis of the relevant market and determination that within that market the parties were not competitors. Consequently, a manufacturer's allocation of exclusive geographic territories to its dealers was not an agreement between competitors. Because competitors' products were available, the exclusive allocation of the manufacturer's products to a particular dealer did not unreasonably limit the products available to the public and was, therefore, enforceable. *Id.* at ¶ 17, 640 P.2d at 951.

¶ 20 The Oklahoma Supreme Court most recently considered section 217 in *Cardiovascular Surgical Specialists Corp. v. Mammana*, 2002 OK 27, ¶ 14, 61 P.3d 210, 212. Dr. Mammana signed a restrictive covenant when he joined an existing cardiovascular and thoracic surgery practice. The covenant prevented him from soliciting or accepting referrals of patients needing cardiovascular or thoracic surgery for nine months following

---

**17.** "Geographic," in this sense, was determined by the location of the customers rather than a geographic area and, therefore, did not prohibit solicitation of a potential client who was not a customer of the employer, even if located next door to a customer of the employer. A similar relevant market analysis is conducted in *Bayly*.

**18.** The *Tatum* Court discussed fair and unfair forms of competition in the context of its Rule of Reason analysis but declined to follow California cases that appear to have decided the "reason-

ableness" of the contract based on the existence of unfair trade practices, such as theft of trade secrets, disparagement of a competitor or its products. These practices are specifically precluded by other statutes in Oklahoma and do not depend on the existence of any contract subject to review pursuant to section 217. *See, e.g.*, Oklahoma Deceptive Trade Practices Act, 78 O.S. 2001 §§ 51–55; *Brenner v. Stavinsky*, 1939 OK 131, 88 P.2d 613.

termination.[19] The parties apparently agreed that cardiovascular and thoracic surgery was the relevant product market. The Court analyzed the effect of the referral prohibition within that market, finding that patients in need of those services normally seek less specialized treatment in the first instance and are then referred by their treating physician for surgery. Consequently, cardiovascular and thoracic surgeons are "dependent on referrals from other physicians" for their medical practice. *Id.* at ¶ 3, 61 P.3d at 211. As previously discussed, a limitation on production of this nature was of concern to the common law because it "seeks a monopoly" for the existing business. *Id.* at ¶ 17, 61 P.3d at 213. *See also Standard Oil,* 221 U.S. at 52, 54–55, 31 S.Ct. at 513. The Court, therefore, refused to enforce the restraint because it would effectively eliminate Mammana's ability to practice medicine and deprive the public of his services, both of which would be contrary to the purpose of section 217. These decisions direct our Rule of Reason analysis in this case.

## II. The Non–Solicitation Agreement

¶ 21 Because the single issue preserved for appeal addresses the non-solicitation provision of the parties' covenant not to compete, we are only concerned with the last four sentences of that provision.[20] The difficulty in this appeal is in determining what that provision means. The language is subject to several interpretations.

¶ 22 Consequently, to the extent they agree, the parties' understanding of the contract terms is controlling. 15 O.S.2001 § 152. A fair summary [21] of the non-solicitation provision appears at page 7 of Curler's reply brief in support of her motion for summary judgment:

1. All clients previously served by Ms. Curler are the "property" of Vanguard.

2. Ms. Curler "releases" all rights to the marketing of environmental and safety compliance services to Vanguard.

3. Ms. Curler cannot make any contact with "clients" as regards Vanguard or "its services."

4. Ms. Curler cannot, for five years, contact any client that "has carried on business" in the environmental compliance business in which Vanguard operates.

The parties agree that the term "clients" is not defined. Curler argues the term includes not only those who were customers of Vanguard at the time her employment was terminated but also any other entity that had ever been a Vanguard customer and any Vanguard customer, past or present, who solicits Curler to provide environmental and

---

19. The covenant at issue also prevented Mammana from (1) practicing cardiovascular or thoracic surgery within twenty miles of his former employer's office and (2) soliciting patients for one year following termination. The employer admitted that the first provision effectively precluded Mammana from being able to practice in his specialty. The Court was unpersuaded by the employer's argument that the restriction was, nonetheless, reasonable because Mammana was not prevented from practicing some other specialty. The Court then found the second provision enforceable pursuant to *Tatum.*

20. **Covenant to not Compete, Trade Secret, Confidentiality, Proprietary Information, Works of Authorship, Issues Related to Departure, and Client List Protection.** . . . The Employee agrees that, upon his departure, he shall not establish a competitive business to Vanguard's Environmental Compliance Services . . . in the county and all adjacent counties in which Vanguard operates a business address for a period of no less than one year from the date of departure without the expressed [sic] prior written consent of the Employer. . . . Employee agrees that any and all clients established and served as a result of the performance of his assigned duties-for which he has been compensated under the terms of the mutual Employment Agreement-become and remain the property of the Employer. Upon departure of the Employee, the Employee releases all rights to the marketing of environmental and safety compliance services to the Employer's discretion and shall not interfere with the employer's right to do so. No post-employment contact with clients shall be made by the Employee as it regards Vanguard or its services. Any client that has carried on business in the environmental compliance business in which the Employer operates its services (EPA, OSHA, & DOT legislation), shall not be contacted by the departed Employee for a period of no less than five years from the date of departure.

21. Although appearing in Curler's reply, Vanguard did not ask to file a response contesting this characterization, and Curler's summary is consistent with Vanguard's interpretation to the extent contained in its Objection to Defendant's Motion for Summary Judgment.

safety compliance services. Vanguard does not disagree but contends that a definition is not necessary because "Ms. Curler is very much aware as to the obvious definition of the term."

¶ 23 Consequently, as the parties appear to have understood their agreement, the non-solicitation provision prevents Curler from (1) marketing any kind of environmental and safety compliance services to any entity, whether a present or former client of Vanguard; (2) contacting past or present Vanguard clients regarding the services provided by Vanguard; and (3) contacting any other user or supplier (i.e., "carried on [the] business") of environmental compliance services. None of these provisions contain any geographical or time limitation except the third; it is limited to five years. We determine the enforceability of each of these provisions separately. *Mammana*, 2002 OK 27 at ¶¶ 16–20, 61 P.3d at 213–14.

### A. The Relevant Market

¶ 24 Vanguard uses various descriptions of its business, Curler's duties and responsibilities as a Vanguard employee and the activities it intends to preclude. From this material we determine the market relevant to Vanguard's non-solicitation agreement.

¶ 25 The Employment Agreement states that Vanguard "is engaged in the business of Environmental Compliance Services [related to] legislation enacted at the local, state and federal levels by governmental bodies related to the Environmental Protection Agency (EPA), Occupational Safety & Health Administration (OSHA–DOL), and Department of Transportation (DOT)." The Agreement provides that Curler will be assigned duties to be performed "at Tulsa, OK & FIELD WORK WITH CLIENTS THROUGHOUT THE U.S. and at other places as ... the Employer may require." Curler's initial position was Environmental Manager and her duties were described as follows: "Conduct site investigations, assimilate env'l regulations as required, and develop compliance documentation according to the systems as provided and instructed at Vanguard [and] collaborate with other employees in accomplishing the above, either in a financial sense

or outside sales with regard to renewals." After approximately five and one-half years, Curler's title changed to Director of Engineering, but any corresponding change in her duties or responsibilities is not apparent from the record. The factual record is also insufficient to develop a precise relevant market definition, but, in general, the product market appears to be environmental compliance services related to enforcement of EPA, OSHA–DOL and DOT statutes and regulations and any state or local counterparts. The geographic market is Tulsa, Oklahoma, and wherever else Vanguard clients are located. To determine the enforceability of the Vanguard non-solicitation agreement, we analyze the effect of each provision within this market or any narrower market relevant to a particular provision.

### B. The Marketing Ban

¶ 26 As a preliminary matter, the agreement between Vanguard and Curler, to the effect that "established clients" are the property of Vanguard, is of no consequence. It does not restrict Curler from any activity. However, to the extent it is intended to limit the economic choices of third parties, it would be unenforceable. *Bayly*, 1989 OK 122 at ¶ 18, 780 P.2d at 1175 (absent active solicitation, a restraint on former employee's dealings with clients of former employer is unenforceable). The first restraint in Vanguard's non-solicitation clause prohibits Curler from marketing. Vanguard defines the product market relevant to this prohibition as environmental and safety compliance services. There may be characteristics unique to the environmental and safety compliance services market that make a broad restriction on marketing reasonable, but Vanguard has made no showing to that effect.

¶ 27 From the record before the Trial Court, this provision would prohibit all forms of marketing in any geographic area, no matter how indirect and irrespective of audience, including those who are not, and never have been, Vanguard customers. If marketing were not a significant method of developing new business in the environmental and safety compliance services market, it is doubtful that Vanguard would have included the pro-

vision in its contract. Further, the contract makes specific reference to Vanguard's proprietary marketing software "Vantrack" but does not limit the marketing ban to unauthorized or post-employment use of Vantrack.

¶ 28 Whatever its other purposes, it appears Vanguard intended for the marketing ban to protect it from competition for new clients from any marketing efforts by Curler.[22] This restriction, in the absence of some justification not apparent in this record, is like the prohibition on accepting referrals that the Oklahoma Supreme Court found unenforceable in *Mammana*. Therefore, Vanguard's marketing ban is unenforceable.

### C. The Client Contact Prohibition

██ ¶ 29 As Curler points out, this provision prohibits her from contacting former Vanguard clients as well as Vanguard's existing clients. The relevant product market is defined as Vanguard or "its services." First, Vanguard has not demonstrated any legitimate interest it has in protecting its former clients from being contacted by Curler, and it cannot prohibit existing clients from contacting her. *Bayly*, 1989 OK 122 at ¶ 18, 780 P.2d at 1175.

¶ 30 Second, to the extent this provision is intended to prevent Curler from engaging in activities in which she was not involved while employed, Vanguard has not shown that the restriction is necessary to protect its business. Curler was employed as an Environmental Manager and later as Director of Engineering with specifically defined duties and responsibilities. Vanguard's services extend to EPA, OSHA and DOT regulations. Certainly, the later two encompass more than just environmental matters. If Vanguard's business and Curler's duties only involved the environmental aspects of these regulations, that is not apparent from the record. It appears, therefore, that Vanguard is attempting to protect all aspects of its business from competition, not just the aspects of its business in which Curler was involved.

¶ 31 Third, there is no geographical or time limitation regarding this restriction. Paragraph 2 of the Employment Agreement assigns Curler to perform her duties at Tulsa, Oklahoma and client locations "THROUGHOUT THE U.S." As was true in *Tatum*, to the extent Vanguard has clients located outside Tulsa, Oklahoma, the agreement could have limited solicitation to those existing customers with whom Curler had some contact, regardless of where they were located. As drafted, this agreement would prevent Curler from contacting former and existing Vanguard clients including those who had relocated to an area not serviced by Vanguard. Vanguard did not offer evidence of its lack of "market power" in an effort to demonstrate this restriction would have no anticompetitive effect in the relevant market. And, in the absence of such evidence, if it exists, this provision is not reasonably crafted to protect only Vanguard's legitimate business interests. It is significantly broader than the "hands off established customers" provision found enforceable in *Tatum* and, on the basis of this record, unjustifiably so.

██ ¶ 32 Finally, despite the severability clause in the Employment Agreement, "there is more amiss here than can be reformed effectively." *Bayly*, 1989 OK 122 at ¶ 14, 780 P.2d at 1173. This provision cannot be judicially conformed to an enforceable covenant without significantly rewriting the parties' agreement. For example, at the time of contracting, for what period of time would the parties have considered this ban reasonably necessary to protect Vanguard's legitimate business interests without unduly burdening Curler? Accordingly, the ban on client contact is unenforceable.

### C. The Supplier Contact Ban

██ ¶ 33 The final provision of the Vanguard agreement appears directed at a different group of "clients" than those targeted by the client contact ban discussed in the previous section. It reaches any entity that

---

**22.** That interpretation is consistent with the clear intent of the contract provision preceding the marketing ban, which prohibits Curler from leaving Vanguard and establishing a "competitive business to Vanguard's Environmental Compliance Services." For obvious reasons, Vanguard did not argue in this appeal that this provision was reasonable and enforceable.

has carried on business in the same environmental compliance business in which Vanguard operates.[23] It, therefore, prohibits contact with not only potential customers but also with suppliers of materials or services necessary to the environmental compliance business. There is no geographical limitation and, therefore, the provision would prevent Curler from, in essence, establishing an environmental compliance service business in any locale Vanguard does not currently service and has no intention of servicing in the future and with respect to customers that will never become customers of Vanguard. The attempt to prevent competition for new customers is unenforceable. *Mammana*, 2002 OK 27 at ¶ 18, 61 P.3d at 213. The attempt to foreclose access to the sources of goods and services necessary to compete is also unenforceable. *Id.* And while a covenant unrestricted as to geographic area may be enforceable if reasonably necessary to protect the interests of the covenantee, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283 (6th Cir.1898), Vanguard has made no such showing here.

▪ ¶ 34 Finally, the provision seeks to impose this restriction for five years. Five-year restrictions have been enforced in conjunction with the sale of the goodwill of a business. *See e.g., Herrington v. Hackler*, 1937 OK 720, 74 P.2d 388; *Hartman v. Everett*, 1932 OK 460, 12 P.2d 543; *Graves v. Fitzpatrick*, 1927 OK 346, 260 P. 10; *Wall v. Chapman*, 1921 OK 367, 202 P. 303. The goodwill of established customers is at issue when a departing employee agrees not to solicit those customers because goodwill "is the value that results from the probability that old customers will continue to trade with an established concern." *Freeling v. Wood*, 1961 OK 113, ¶ 12, 361 P.2d 1061, 1063. *See also* 60 O.S.2001 § 315, "goodwill of a business is the expectation of continued public patronage." However, in the cases involving the sale of goodwill, separate consideration was paid for the goodwill. Vanguard has not shown that Curler received any severance payment or termination bonus that might

justify a five-year restriction. To date, the longest period of time approved as reasonable in the context of an employee non-solicitation agreement is two years. *See Tatum*, 1970 OK 27 at ¶ 2, 465 P.2d at 452. *See also Key Temporary*, 1994 OK CIV APP 123 at ¶ 10, 884 P.2d at 1216 (finding a nine-month period reasonable). A three-year period was rejected in *Loewen Group Acquisition Corp. v. Matthews*, 2000 OK CIV APP 109, ¶ 18, 12 P.3d 977, 981, as longer than necessary to protect the employer's legitimate business interests. A ten-year restriction in an unlimited geographic area was rejected as unreasonable in *Cohen Realty, Inc. v. Marinick*, 1991 OK CIV APP 71, ¶ 8, 817 P.2d 747, 749. Consequently, there is no aspect of Vanguard's non-solicitation agreement that is enforceable.

## CONCLUSION

¶ 35 Limiting our review to the issue that Vanguard properly preserved and raised on appeal, we find that the non-solicitation provisions of the Covenant Not to Compete are, as a matter of law, unenforceable and cannot be judicially reformed to make them enforceable because that would require extensive judicial alteration and the addition of material terms and provisions essential to the parties' contract.

¶ 36 We find that the Trial Court did not err in granting summary judgment to Curler. Accordingly, we affirm the judgment appealed.

¶ 37 **AFFIRMED.**

RAPP, C.J., and WISEMAN, J., concur.

---

23. Like the client contact ban, the relevant product market defined here appears to include aspects of Vanguard's business in which Curler was not involved and, perhaps, in which even Vanguard was not involved.